UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| OPTIONS HOME HEALTH OF | ) | |
| NORTH FLORIDA, INC., | ) | |
| BRIAN VIRGO, and | ) | |
| JOSH GOODE, | ) | |
| | ) | |
| Plaintiffs, | ) | Action No. 5:11-cv-166-JMH |
| | ) | |
| v. | ) | |
| | ) | |
| NURSES REGISTRY AND | ) | **MEMORANDUM OPINION & ORDER** |
| HOME HEALTH CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**       **       **       **       **

This matter is before the Court on Plaintiffs' Motion for Summary Judgment on Count I of the Complaint (D.E. 81), Plaintiffs' Motion for Summary Judgment on Counts II and VI of the Complaint (D.E. 79), Plaintiffs' Motion for Summary Judgment on Counts II and III of Defendant's Counterclaim (D.E. 80), Defendant's Motion for Summary Judgment (D.E. 78), and Defendant's Motion to Amend the Counterclaim (D.E. 82). All parties have responded (D.E. 83, 84, 85, 86, 91) and replied (D.E. 87, 88, 89, 90, 92). Thus, these motions are now ripe for review.

This dispute centers around Defendant Nurses Registry's purchase of the assets of Plaintiff Options Home Health of North Florida, Inc. ("Options") and the effect of a change in the law prohibiting the transfer of Options' existing Medicare License on the parties' agreement. For the reasons that follow this Court will grant summary judgment to Plaintiffs in part and deny it in part, deny summary judgment to Defendant, and deny Defendant's motion to amend. The issue of damages remains pending for a jury[1] trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Asset Purchase Agreement & Closing Statement

Plaintiff Options, a Florida company founded and previously owned by Plaintiffs Brian Virgo and Josh Goode, operated as a home healthcare service business. (D.E. 1 at 2–3). In June 2009, Plaintiffs and Defendant Nurses Registry and Home Health Corporation ("Nurses Registry") entered into an asset purchase agreement (the "APA") providing for the sale of essentially all of Options' assets for a price of $650,000. (D.E. 101-1 at 10). The

---

[1] This Court's scheduling order (D.E. 51) contemplated a bench trial per the Complaint (D.E. 1). Subsequently, however, Defendant's requested a jury trial in their Amended Answer and Counterclaim (D.E. 56). The parties are invited to address deadlines for jury instructions and other related issues at the preliminary pretrial conference (D.E.102) before Judge Wier on May 10, 2013.

assets covered by the agreement included Options' tangible personal property, contracts, inventory, work-in-process, books, records, goodwill, intellectual property, licenses, certain insurance proceeds, intangible assets, claims and defenses, and leased personal property, as set forth in the APA and schedules thereto. (D.E. 101-1 at 8—9). The APA provided that the closing would occur on the later date of August 25, 2009, or on the date at which all of the contingencies set forth in the APA were met, whichever occurred later.

Plaintiff Goode was to remain on staff as an acting DON/Administrator for a certain time period during the transition, and, under the APA and incorporated Trust Agreement, Nurses Registry was required to pay him $75,000 upon his departure. (D.E. 101-1 at 11; D.E. 100-3). Although it appears that Nurses Registry paid Plaintiff Goode a sum classified as salary,[2] it is undisputed that the $75,000 fee was never paid. (D.E. 78-2 at 6).

Following the execution of the APA, Options and Nurses Registry executed a "Closing Statement" in February, 2010.

---

[2]   During his term of employment Plaintiff Goode was entitled to receive a salary of $65,000 in addition to the $75,000 payment. (D.E. 100-2 at 95). There has not been any allegation by Plaintiffs that the salary was not paid, only that the fee contained in Section 2.5 and the Trust Agreement remains unpaid.

(D.E. 1-2 at 1).   The Closing Statement stated that "the issuance of the Medicare License is a prerequisite and condition to the duty of [Nurses Registry] to pay the Purchase Price set forth in this Settlement Statement." (D.E. 1-2 at 1).   Further, the Closing Statement re-allocated the purchase price, such that $2,000 was allocated to the tangible items set forth in 2.1(a) and 2.1(c) of the APA,[3] and the remaining $648,000 towards the intangible items set forth in Section 2.1 and Schedule 2.1 of the APA.[4]   The Closing Statement also provided that the closing would be "void *ab initio*" and the total Purchase Price, except for the $20,000 deposit, returned to Nurses Registry "if the Medicare License is not issued to [Nurses Registry] for any reason not within the control of [Nurses Registry]. . . ."  (D.E. 1-2 at 2).

---

[3]    Section 2.1(a) includes all tangible owned personal property, including "all fixed assets, equipment, machinery, supplies and other owned tangible personal property set forth in Schedule 2.1(a)." (D.E. 100-1 at 8). Section 2.1(c) includes all inventory and work-in-process of Options. (D.E. 100-1 at 8).

[4]    Presumably, the remainder of Options' listed assets in Section 2.1 are, under the contract language, the intangible items. They include Options' contracts, books and records, goodwill, licenses, intellectual property, present and future insurance proceeds, counterclaims, leased personal property, and all other intangible assets. (D.E. 100-1 at 8).   Notably, under Section 2.1(g), which purports to list the licenses transferred in the transaction, the parties listed "none."  (D.E. 100-2).

4

To transfer Options' Medicare license, Nurses Registry filed an Application for a "Change in Ownership" ("CHOW"). (D.E. 78-2 at 5—6). While the CHOW application was pending, changes were made to federal law that prevented Nurses Registry from obtaining Options' Medicare license. (D.E. 78-2 at 6). Specifically, an amendment to 42 C.F.R. § 424.550 was enacted, which has been termed as the "36-month rule." Under § 424.550,

> [I]f there is a change in majority ownership of a home health agency . . . within 36 months after the effective date of the [home health agency]'s initial enrollment in Medicare or within 36 months after the [home health agency]'s most recent change in majority ownership, the provider agreement and Medicare billing privileges do not convey to the new owner.

42 C.F.R. § 424.550(b)(1). Instead, the prospective home health agency's owner had to re-enroll in the Medicare program or obtain a state survey or accreditation from an approved accreditation organization. 42 C.F.R. § 424.550(b)(1). Because this rule was deemed to apply to the transaction at issue, it was determined that Options' license was not transferable. (D.E. 78-12). Nurses Registry applied to acquire a new Medicare license of its own and received final approval in August, 2011. (D.E. 1 at 7; D.E. 56 at 6; D.E. 85-2 at 3—4).

To date, of the $650,000 purchase price, Nurses Registry paid Options a $100,000 deposit under the APA,

$20,000 of which was determined by the parties to be nonrefundable. (D.E. 101-1 at 10; D.E. 101-7 at 2). While Nurses Registry has enjoyed the benefits of all of Options' assets, with the exception of the transfer of Options' specific Medicare license, Nurses Registry has refused to pay the remainder of the purchase price, or the $75,000 fee to Plaintiff Goode. (D.E. 78-2 at 6).

### B. Medicare Overpayments

While the CHOW was pending, as well as during the period that Nurses Registry was waiting to receive its new license, Nurses Registry billed Medicare using Options' old license number and accepted advance payments from Medicare associated with these billed services. (D.E. 1 at 10; D.E. 56 at 6; D.E. 83-1 at 4).[5] When the Center for Medicare ("CMS") determined that some of Nurses Registry's billed services were unnecessary (a routine practice according to the pleadings), it sought to re-claim money from its previous payments for the unnecessary services.[6] (D.E. 1 at

---

[5] While Nurses Registry does not seem to dispute that it initially received the funds in question, it does dispute the notion that it made a profit from the transaction in its entirety. Only the first factual assertion is material for the purposes of this summary judgment order; therefore, since Nurses Registry does not dispute that it initially received the Medicare funds, consideration of this fact at the summary judgment stage is still appropriate.

[6] This is a common Medicare practice. As stated in the Complaint, "Medicare often makes an advance payment for

10—11; D.E. 56 at 6).   Nurses Registry ignored these letters at first but, later, forwarded the accumulated demand letters and delinquent notices to counsel for Options.   (D.E. 1 at 11; D.E. 56 at 6—7; D.E. 79-7). According to these documents, CMS now seeks to recover roughly $80,000 plus accumulating interest from Options, a company that is no longer in existence.   (D.E. 79-7).   As the previous owners of Options, Plaintiffs Virgo and Goode are unable to apply for another billing number and/or open another healthcare agency as long as this debt remains unpaid.[7]  (D.E. 88 at 7).

## II. STANDARD OF REVIEW

Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   In deciding a motion for summary judgment, the factual evidence and all reasonable inferences must be construed in the light most favorable to the nonmoving party.   *Anderson v. Liberty*

---

services provided by a [Home Health Agency] and may seek claw back or offset those payments at a later time if a reimbursement is later disallowed." (D.E. 1 at 10).

[7]   Federal regulations provide that "CMS may deny a provider's or supplier's enrollment in the Medicare program" if "[t]he current owner . . . has an existing overpayment at the time of filing of an enrollment application."  42 C.F.R. § 424.530(a)(6).

*Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Summers v. Leis,* 368 F.3d 881, 885 (6th Cir. 2004).

The judge's function on a summary judgment motion is not to weigh the evidence, but to decide whether there are genuine issues of material fact for trial. *Anderson,* 477 U.S. at 249; *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). A material fact is one that may affect the outcome of the issue at trial, as determined by substantive law. *Anderson*, 477 U.S. at 242. A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *Summers*, 368 F.3d at 885.

**III. DISCUSSION**

**A. Defendant's motion to amend the counterclaim**

Nurses Registry filed a counterclaim in this action, alleging that Plaintiffs induced them to enter the contract through fraud and negligent misrepresentation. (D.E. 56). In the original counterclaim, Nurses Registry averred that these two claims were based on the fact that Plaintiffs knew or should have known at the time of contracting that the Medicare billing number could not be transferred. (D.E. 55 at 15—17). After Plaintiff filed a summary judgment motion on Nurses Registry's counterclaim (D.E.

80), Nurses Registry filed a motion to amend the counterclaim. (D.E. 82). In this motion to amend, Nurses Registry argues—for the first time in motions or pleadings before this Court—that its fraud and negligent misrepresentation claims are based on a statement made by Plaintiffs that Florida was planning to introduce a moratorium on the transfer of home health agencies and that, if Nurses Registry wanted to purchase Options, it should move quickly. (D.E. 82 at 1—2). Although this is the first time that the Court has seen this statement, Defendant disclosed the statement to Plaintiffs in interrogatories and Plaintiffs' counsel asked witnesses about the statement during depositions. (D.E. 92-1 at 8; D.E. 82-2 at 5—6). It is undisputed that this moratorium never occurred. (D.E. 82-2 at 6).

Defendant argues that it should be given leave to amend its counterclaim under Fed. R. Civ. P. 15(a)(2) to include Plaintiffs' alleged statement that Florida would be enacting a moratorium on the transfer of home healthcare services. (D.E. 82). Further, although Defendant does not expressly make a motion to add Plaintiff Virgo as a party to the counterclaim, he is added as a defendant to the proposed second amended counterclaim. (D.E. 82-3). Plaintiffs argue that Defendant has not shown good cause

9

for such amendments, that the amendments would be prejudicial to Plaintiffs at this late stage in the litigation, and that the amendments would be futile. (D.E. 91). The Court agrees with Plaintiffs and, for the reasons described below, Defendant's motion to amend will be denied.

Under Fed. R. Civ. P. 15(a), the Court must give leave to a party to amend a pleading whenever justice so requires. Fed. R. Civ. P. 15(a). Further, when the deadline for amending pleadings has passed, the movant seeking to amend "first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). The potential prejudice to the nonmovant must be considered when deciding whether to grant the amendment. *Id.* Moreover, if a court determines that allowing the amendment would be futile because the claim would not survive a 12(b)(6) motion, it can deny leave within its discretion. *Anderson v. Merck & Co., Inc.*, 417 F. Supp. 2d 842, 848 (E.D. Ky. 2006); *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991).

First, the deadline for amendments to the pleadings has long since passed and Defendant has not shown good

10

cause, or any cause, for its delay in this circumstance. In this case, it appears that allowing the amendment to include Plaintiffs' alleged statement would not prejudice Plaintiffs since the parties have conducted discovery as if the statement were disclosed in the counterclaim.[8] However, to the extent that Defendant attempts to add Plaintiff Virgo as a party to the counterclaim, the amendment would be prejudicial. Defendant was "obviously aware of the basis for the claim for many months," given that it disclosed the statement to Plaintiffs early in the discovery process and, moreover, it was the Defendant's employees who came forward with the evidence supporting the counterclaim. *Leary*, 349 F.3d at 908. Yet, Defendant has not presented any explanation for failing to include Plaintiff Virgo as a party to the counterclaim earlier in the litigation. Instead, Defendant simply argues that Plaintiffs will not be prejudiced by the amendment. (D.E. 92). The Court disagrees; at this late stage, Plaintiff Virgo would certainly be prejudiced by having to defend a

---

[8] Specifically, in response to Plaintiffs' interrogatory asking for the basis of Defendant's fraud and/or negligent misrepresentation claims, Defendant disclosed the statement at issue. (D.E. 92-1). Plaintiffs' counsel also asked Defendant's witnesses about the statement at depositions, and made clear that he was asking the questions because he believed the statement formed the basis for Defendant's fraud and negligent misrepresentation claims. (D.E. 82-2).

claim that was not brought against him, particularly when Defendant's motion did not explicitly request that Plaintiff Virgo be added as a party. *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 666 (6th Cir. 2005) (district court's refusal to allow plaintiffs to add a new party defendant after the deadline was appropriate when plaintiffs did not show good cause for delay and when plaintiffs did not actually move to amend to add a new party).

Moreover, because Defendant's claims fail as a matter of law, allowing the amendments would be futile. Under Kentucky law, both fraud and negligent misrepresentation require that the defendant reasonably or justifiably rely on a defendant's falsehood or misrepresentation. *See Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (internal citations omitted) ("The plaintiffs reliance, of course, must be reasonable . . . or, as the Restatement states, 'justifiable.'"); *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580—82 (Ky. 2004) (adopting the Restatement's elements of negligent misrepresentation, which requires justifiable reliance).

In this case, if the Court accepts as true that Plaintiffs in fact made this statement, Defendant has not

12

presented any evidence of justifiable reliance. According to the testimony of Jeanie Lemaster, Virgo and Goode indicated that Florida would be enacting a moratorium on the issuance of new licenses on July 1, 2009. (D.E. 82-1 at 3). By that date, the parties had only signed a letter of intent. The APA, and certainly the Closing Statement, came later. To the extent that Nurses Registry relied upon the pending moratorium as an impetus for entering into the contract, it should have ascertained that the moratorium had not, in fact, gone into effect on July 1, 2009, prior to entry of the APA.

Moreover, Lennie House, the owner of Nurses Registry, indicated in his deposition that after Plaintiffs told him about the upcoming moratorium, he did not do any independent research of his own to determine the reliability of this statement, instead merely noting that he assumed that since Plaintiffs were in Florida, they would have inside information about a potential moratorium should one exist. (D.E. 82-2 at 5—6). Although he claims in his deposition that he never would have entered into the contract if he had known that there would not be a moratorium, there was no mention of it in the APA, and the moratorium date had come and gone by the time the parties signed the APA, without any type of moratorium going into

13

effect.  (D.E. 82-2 at 10—11).  In fact, Mr. House admitted that he hadn't even read all of the documents to know whether or not the APA and/or accompanying documents mentioned the moratorium.  (D.E. 82-2 at 6—11).  Quite frankly, if this Court is to believe that Nurses Registry would not have entered into this contract without the moratorium, their level of reliance is neither justifiable nor reasonable, particularly when one considers that Nurses Registry is an experienced business entity. (D.E. 80-5 at 5); *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 428 F. Supp. 2d 675, 682 (E.D. Ky. 2006) (noting that the "Court should consider [the party's] knowledge and experience" when determining whether the "reliance on the misrepresentation was reasonable").  Therefore, even if the Court accepts as true that Plaintiffs made the alleged statement about the moratorium, Defendant did not reasonably rely on it, and its fraud and negligent misrepresentation claims fail as a matter of law.

Accordingly, Defendant's motion to amend is denied because no good cause has been shown for the delay, adding Plaintiff Virgo on this claim would be overly prejudicial and the amendment would be futile because the claims fail as a matter of law.

**B. Motions for Summary Judgment**

**1) Plaintiffs' motion for summary judgment on Defendant's counterclaims for fraud and negligent misrepresentation**

Plaintiffs argue that they are entitled to summary judgment on Defendants' original counterclaims for fraud in the inducement and negligent misrepresentation on the basis that Options and Goode were aware that Options' Medicare billing number could not be transferred to Nurses Registry, but made false statements to the contrary.[9] (D.E. 56). Plaintiffs point out that there is no evidence that they that were aware of the upcoming change in the law that would render the Options' Medicare license non-transferable to Nurses Registry or that Plaintiffs made any false statements about the transferability of Options' license. Nurses Registry agrees. (D.E. 84, 84-1). Accordingly, in the absence of evidence to support Defendant's counterclaims for fraud and negligent misrepresentation,

---

[9] The Court notes that Defendant failed to plead fraud with particularity, as required by Federal Rule of Civil Procedure Rule 9(b). *See U.S. ex. Rel. SNAPP, Inc., v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (holding that the requirement that a party plead fraud with particularity is generally met when the party provides the time, place and content of the alleged fraud). Defendant failed to even hint at the alleged false statement in its counterclaim, let alone include the time, place, or contents. However, Plaintiff has never raised this issue, and the Court declines to address it further given the lack of evidence supporting the claim.

Plaintiffs' summary judgment motion on Counts II and III of Defendant's counterclaim will be granted.

**2) Summary judgment motions on breach of contract claims and unjust enrichment claims relating to the purchase of Options.**

In their Complaint and various summary judgment motions, Plaintiffs focus primarily on two alternative arguments. First, they contend that the APA and Closing Statement, read together, are a valid, enforceable contract, the terms of which are met if a Medicare license, even a new license, was issued to Nurses Registry. If enforced, Plaintiff argues, the contract requires Defendant to pay the purchase price, Plaintiff Goode's $75,000 fee, and the Medicare overpayments. (D.E. 79; D.E. 81). In the alternative, Plaintiffs argue that Defendant has been unjustly enriched by the retention of Options' assets without payment, and, thus, that the above monetary amounts should be restored to Plaintiffs. (D.E. 1 at 13).

On the other hand, Defendant argues that because the transfer of Options' Medicare license was never effectuated, the entire contract became void *ab initio* per the Closing Statement's instruction. (D.E. 101-7 at 2). Thus, Defendant maintains that the contract was void, that it does not have to pay the purchase price, fee to Goode or Medicare overpayments, and that Options should return

16

$80,000 of the $100,000 deposit. (D.E. 78). Therefore, despite its conclusion that the contract is void and that a purchase price is not owed to Options, Nurses Registry apparently believes that it is entitled to retain all of Options' assets previously transferred to it.

The Court does not wholeheartedly agree with either party's analysis. On one hand, the Court agrees, as explained below, that the parties contemplated the purchase of Options' Medicare license under the APA and Closing Statement. However, because the Closing Statement modified the APA to make the acquisition of this license an absolute condition to the contract, the contract became void *ab initio* under its terms when the 36-month rule came into effect and the transfer could no longer be completed. That being said, Plaintiffs correctly argue that once the contract was considered void, Nurses Registry had an obligation to either return Options' assets or pay Plaintiffs for the value of what it acquired. Quite simply, Nurses Registry cannot simultaneously consider the contract void *ab initio* and retain all of Options' assets free-of-charge. Thus, because Defendant retained all of Options' assets without ever paying for their value, Nurses Registry has been unjustly enriched, and application of quantum meruit is in order. For the more detailed reasons

17

which follow, partial summary judgment is granted to Plaintiffs, and summary judgment is denied to Defendants. A triable issue remains as to damages.

> **a) The Closing Statement created an absolute condition that required the transfer of Options' Medicare license before the contract would be complete.**

The parties' arguments about the validity of the contract primarily focus on whether the APA specifically contemplated an actual transfer of Options' Medicare license to Defendant, or if the condition that Defendant acquire a license could be satisfied by the issuance of a completely new Medicare license from CMS. Both parties argue that the plain language of the contract is unambiguous, yet they each subscribe different meanings to it. This Court does not agree.

The APA defines "Licenses" as "all licenses. . . granted or issued by any Person and associated with or related to the Purchased Assets." (D.E. 100 at 5). The APA provides, along with the itemization of all other purchased assets, that "All Licenses" are to be transferred. (D.E. 100 at 8). However, Options' Medicare license is not specifically listed, defined or otherwise referred to in the APA outside of the global references therein. In fact, the schedule attached to the APA which

purports to list the licenses referenced therein simply states, "none." (DE 100-2 at 72).

The Closing Statement, executed subsequent to the APA, operated as a valid modification to the APA, a fact to which the parties agree. *Francis v. Nami Resources Co., LLC*, No. 04-510, 2008 WL 852047, at *5 (E.D. Ky. Mar. 28, 2008) (internal quotations and citations omitted) ("parties who have the right to make a contract have the power to unmake or modify . . . in any manner they choose" and simply making the mutual promise to modify is a "valid form of consideration."). The Closing Statement provided that "the issuance of the Medicare License is a prerequisite and condition to the duty of [Nurses Registry] to pay the Purchase Price set forth in this Settlement Statement." (D.E. 101-7). Earlier in the Closing Statement, it states that Section 5.1 of the APA "requires the State of Florida to issue a license to the Seller…" (D.E. 101-7). Like the APA, the Closing Statement does not reference or identify Options' particular Medicare license by name, number, or any other identifying factor.

Plaintiffs argue that because the plain language of the Closing Statement only requires that "the Medicare license" be "issued" to Defendant, the requirement could be fulfilled so long as Defendant eventually received such a

license.  (D.E. 86 at 6—11).  There is no dispute that Nurses Registry did in fact receive a new Medicare license from CMS in August 2011; thus, if the Court adopted Plaintiffs' argument, then the contract became fully enforceable once the license was issued.  (D.E. 85-2 at 3—4).  On the other hand, Defendant argues that, pursuant to the APA, it purchased "all Licenses" of Options.  (D.E. 101-1 at 8).  Thus, when the APA and the Closing Statement are construed together, Defendant concludes that the Medicare license referred to in plain language of the Closing Statement must be construed as Options' specific Medicare license.  (D.E. 78).

Despite the APA's failure to specifically identify Options' Medicare license in its text, the Court finds that its language refers to the Medicare license owned by Options at the time parties entered into the agreement. However, the Closing Statement's language muddies the issue.  The term "transfer" suggests, in this case, the transfer of ownership from one entity to another.  However, transfer is not used in the Closing Statement—it uses the term "issue."  This plain reading of that term suggests to this Court that the parties contemplated the issuance of a

new, initial license.[10]   Moreover, the Closing Statement refers to "the Medicare License" in some instances—suggesting Options' Medicare license—and "a Medicare License" in others—suggesting that any license would suffice.   Without any type of definition or further identification by the parties in the agreement itself, this Court finds that these terms are ambiguous.

Once an ambiguity is determined to exist, the Court is entitled to utilize extrinsic evidence to determine the parties' intent.  *See Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 793 (W.D. Ky. 2005) (explaining that under Kentucky law, if there is an ambiguity on the face of a contract, extrinsic evidence may be used to interpret the language).   Where, as here, there is no material fact in dispute, this Court may determine the parties' intention, and interpret the contract, as a matter of law.   *FS Invs., Inc. v. Asset Guar. Ins. Co.,* 196 F.Supp.2d 491, 498-99 (E.D. Ky. 2002)(citing *Cook United, Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974)).   Options and Nurses Registry admitted that the original intent of all parties involved was that Options' Medicare license

---

[10] By way of example, even the parties in their briefs and depositions have used "transfer" to consistently refer to the purchase of the Options Medicare license by Nurses Registry and have used "issue" or "issuance" to refer to the new license given to Nurses Registry.  (DE 85-2 at 3).

would transfer to Nurses Registry.  (D.E. 59 at 3; D.E. 78-2 at 2).   The parties do not argue and, indeed, there is no evidence to suggest, that they intended for the Closing Statement to alter the original meaning of the APA – or remedy the transferability issue created by the 36-month rule.   In fact, the parties agree that the Closing Statement was provided to satisfy Florida state authorities' request for evidence of the completion of the transaction, rather than to address the transferability issue.[11]  (D.E. 81-1 at ¶15).  Although "ambiguity lurks" in the language of the Closing Statement, summary judgment is proper since "the extrinsic evidence presented to the court supports only one of the conflicting interpretations" *GenCorp., Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 818—19 (6th Cir. 1999).  Accordingly, this Court concludes that the parties intended for the license referred to in the Closing Statement to be Options' specific Medicare license.

The Closing Statement provides that the closing is "void *ab initio*," "if the Medicare License is not issued to [Nurses Registry] for any reason not within the control of

---

[11] Nurses Registry, counsel for which drafted the Closing Statement, maintains that it's principals were unaware of the 36-month rule at the time the Closing Statement was submitted to Options.  (D.E. 81-1 at 4; D.E. 78-2 at 5-6).

[] [Nurses Registry]…" (D.E. 101-7).   Thus, this Court agrees with Nurses Registry's argument that the Closing Statement modified the APA to the extent that it transformed the requirement that Defendant receive Options' Medicare license into an absolute condition, which, if not met, would make the contract void *ab initio*, relieve Defendant of its obligation to pay the remainder of the purchase price, and require Options to return $80,000 of the $100,000 already paid by Defendant in deposits.   (D.E. 101-7 at 2).   Because CMS could not issue Options' Medicare license to Defendant given the newly adopted 36-month rule, the fulfillment of this condition became impossible.   Thus, per the Closing Statement, the party's transaction became void *ab initio*.

### b) Because Defendant has been unjustly enriched, application of quantum meruit is necessary.

This does not end the analysis, however, because Defendant has been unjustly enriched.   The remedy in this circumstance is not, as Nurses Registry suggests, that Nurses Registry is relieved of its obligation to compensate Options.   Nurses Registry did not treat the contract as void *ab initio*-to do so would have required the return of Options' assets.   Now, due to the passage of time and other practical considerations, the parties cannot be returned to

their respective positions before the contract existed. Thus, this Court must turn to equitable remedies. In Kentucky, a claim for unjust enrichment requires a showing that 1) a benefit was conferred at the plaintiff's expense; 2) the defendant appreciated that benefit; and 3) the defendant's retention of the benefit without payment for its value would be inequitable. *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. App. 2009). These three elements have been satisfied in this case.

First, Plaintiffs clearly conferred benefits on Defendant by transferring all of Options' tangible and intangible assets to Defendant. Indeed, in addition to Options' tangible property, Defendant acquired, among other things, Options' contracts, goodwill, insurance proceeds, and accounts payable. (D.E. 101-1 at 8—9). Given that Nurses Registry operated in Florida as a home healthcare service using Options' tangible and intangible assets for a number of years, Nurses Registry has appreciated this benefit.

The Court has no doubt that, to the extent these assets were worth more than the $100,000 deposit, allowing Defendant to retain these benefits would be inequitable. As it stands, there is no dispute that Defendant essentially acquired these benefits for free since, aside

24

from the $100,000 deposit, Defendant has not paid the purchase price for the acquired assets, nor has it compensated Options for the temporary use of its Medicare billing number. Moreover, not only did Defendant use Plaintiffs' number without compensating them, it has also stuck Plaintiffs with a bill that, according to the Complaint, amasses more than $80,000 worth of liabilities that Plaintiffs did not incur, as discussed below. (D.E. 1 at 11).

Defendant does not dispute that it used Options' Medicare license number to bill CMS while it was waiting to receive its own license, amassing a substantial sum of money as a result. Therefore, to the extent that Options' assets and temporary use of its Medicare license number are worth more than the $100,000 deposit in escrow, a decision which this Court declines to make today, they represent benefits conferred upon and appreciated by Defendant that will leave Defendant unjustly enriched if Plaintiffs remain uncompensated.

Although there is also no dispute that Defendant did not pay the $75,000 payment to Plaintiff Goode, all appear to be in agreement that Goode received his bi-weekly salary amounting to $65,000. Assuming this amount represents the reasonable value of Goode's services, a fact about which

the Court cannot decide based on the information before it, then Plaintiffs are not entitled to receive damages for this payment. *See Thoro-Graph, Inc. v. Lauffer*, -- S.W.3d --, Nos. 2010-CA-000891-MR, 2010-CA-000914-MR, 2012 WL 5038254, at *3 (Ky. App. Oct. 29, 2012) (citing *Cherry v. Augustus*, 245 S.W.3d 766, 779 (Ky. App. 2006)) (noting that recovery in quantum meruit entitles one only to the reasonable value of provided services). The value of those services is, however, an issue for another day.

Accordingly, it remains for the trier of fact to determine the amount of damages due to Plaintiffs for their unjust enrichment claim.

### 3) Motions for summary judgment based on the Medicare overpayments.

As discussed above, Nurses Registry has been further unjustly enriched by using Options' Medicare license and receiving funds billed under that license but refusing to repay the overpayments. From the Court's understanding, if Plaintiffs had not allowed Nurses Registry to use Options' Medicare license for some time period, Defendant would have been completely unable to earn income during that time. Moreover, Defendant also extracted an additional benefit from the use of Plaintiffs' billing number through its refusal to pay the Medicare overpayments demanded from CMS

for the services that it actually billed.  In essence, by refusing to pay the liability, it is retaining money that it otherwise would have had to pay back to CMS if Defendant had been operating under its own billing number. Therefore, this temporary use of Options' Medicare number and refusal to pay the liabilities associated with that use constitute benefits conferred upon and appreciated by Nurses Registry.

In response to Plaintiffs' claim with respect to the Medicare overpayments, Defendant points out that under Count VI of Plaintiffs' Complaint (seeking injunctive relief on the Medicare overpayment liabilities), Plaintiffs only claim that Virgo and Goode were harmed by Nurses Registry's failure to pay the overpayment liability, not Options. (D.E. 78-1 at 14—18).  Therefore, it argues that any claim by Options for injunctive relief concerning the Medicare overpayment liabilities is not properly before the Court. (D.E. 78-1 at 14—18).

Defendant also argues that Plaintiffs Virgo and Goode do not have standing because they cannot show an injury, as they are unable to show that Medicare will seek to recover the funds from them personally.  (D.E. 78-1 at 15—18). Further, Defendant argues that Plaintiffs' claim is not ripe, as Plaintiffs Virgo and Goode cannot show that they

plan to open or have sought to open a new healthcare company. (D.E. 78-1 at 15—18). Using these arguments as a vehicle, Defendant suggests that, because Options is now defunct and because there is no evidence that Plaintiffs Virgo and Goode engaged in any misconduct giving rise to a piercing of the corporate veil, CMS will never be able to recover the money from Virgo and Goode, personally, and, thus, Virgo and Goode should just ignore the demands. (D.E. 78-1 at 16).

The Court is puzzled by Defendant's arguments, and is somewhat baffled by the notion that Defendant essentially asks this Court to authorize Plaintiffs to hide from their federal debt. Regardless, a brief analysis shows that Plaintiffs' claim for the Medicare overpayment liabilities is ripe and properly before the Court.

First, because the Court has chosen to resolve the Medicare overpayment liability issue under Plaintiffs' theory of unjust enrichment instead of granting injunctive relief and because Plaintiffs clearly asserted under Count II of the Complaint that "Nurses Registry will be unjustly enriched if *any of the Plaintiffs*, or their affiliates, is required to refund Medicare overpayments caused by services provided and bills by Nurses Registry using the assets purchased from Options," the claim by Options is, contrary

to Defendant's argument, properly before the Court. (D.E. 1 at 13) (emphasis added).

Moreover, Plaintiffs Virgo and Goode do indeed have standing to bring the claim, as they have suffered an "injury in fact" from Nurses Registry's failure to pay the Medicare overpayment liabilities. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In order for a plaintiff to suffer an injury sufficient to confer standing, there must be an "invasion of a legally protected interest" which is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical". *Id.* (internal quotations and citations omitted). In this case, the law is clear that if Plaintiffs decided to re-enroll in the Medicare program as healthcare providers, their uncollected debt would prohibit CMS from granting their enrollment application because of the pre-existing overpayment to Options. *See* Medicare Program Integrity Manual § 15.8.4 (Nov. 19, 2012) *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c15.pdf ("Per 42 CFR 424.530(a), the contractor must deny an enrollment application if . . . [t]he current owner . . . has an existing overpayment at the time of filing an enrollment application."). This present inability to return to work in the healthcare

provider business represents a concrete actionable injury. Further, there is no question that Options, as a corporate entity, has been concretely injured by being assessed with overpayment liabilities that it did not incur.

Finally, even though Plaintiffs have not applied to form a new home healthcare service, and, thus, have not had an application formally denied by CMS, their claim is still ripe for review. Determining whether a claim is ripe involves evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 987—88 (6th Cir. 2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The ripeness doctrine, however, does not require the harm to have actually occurred. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation*, 461 U.S. 190, 201 (1983) ("One does not have to await the consummation of threatened injury to obtain preventive relief.").

In this specific case, the issue of whether Nurses Registry has been unjustly enriched by refusing to pay the Medicare overpayment liabilities is purely legal since Nurses Registry openly admits that it is the one who received the initial payments from CMS. Thus, it is simply

a legal question of whether or not this constitutes unjust enrichment. Moreover, if a decision were postponed until Plaintiffs Virgo and Goode actually submitted an application, substantial hardship would incur because the interest on the overpayment debt is continually increasing. Therefore, because the issues are fit for judicial decision, and because substantial hardship would be incurred if a decision is postponed, the claim is ripe. *Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO*, 332 F.3d at 987—88.

Defendant does not dispute that it used Options' Medicare license number to bill CMS while it was waiting to receive its own license, amassing a substantial sum of money as a result. Therefore, to the extent that Options' assets and temporary use of its Medicare license number are worth more than the $100,000 deposit in escrow, a decision which this Court declines to make today, they represent benefits conferred upon and appreciated by Defendant that will leave Defendant unjustly enriched if Plaintiffs remain uncompensated.

Therefore, for the reasons stated above, Defendant's summary judgment motion and motion to amend the counterclaim are denied. Plaintiff's various summary judgment motions are granted in part and denied in part.

As previously alluded to, triable issues of fact remain as to the worth of Options' assets acquired by Defendant, the amount of overpayments made to Nurses Registry, and the value of services provided by Plaintiff Goode.

**IV. CONCLUSION**

For the reasons stated above, **IT IS ORDERED:**

(1) that Defendant's Motion to Amend the Counterclaim (D.E. 82) is **DENIED**;

(2) that Defendant's Motion for Summary Judgment (D.E. 78) is **DENIED**;

(3) that Plaintiff's Motion for Summary Judgment on Counts II and III of Defendant's Counterclaim (D.E. 80) is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE**;

(4) that Plaintiffs' Motion for Summary Judgment as to Count 1 (D.E. 81) and Counts II and VI as they relate to Claims made by Medicare for Reimbursement (D.E. 79) are **GRANTED IN PART AND DENIED IN PART**; and

(5) this matter remains set for a final pretrial conference on May 20, 2013 and trial on June 11, 2013, subject to intervening orders of this Court. The Court further notes that this matter is set for a preliminary pretrial conference before Judge Wier on May 10, 2013 at

10:00 a.m. The parties are encouraged to engage in settlement negotiations before that time.

This the 6th day of May, 2013.



Signed By:

**_Joseph M. Hood_**

**Senior U.S. District Judge**